UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 24-CR-14058-MIDDLEBROOKS/MAYNARD(s)

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

DENZIL OLAJUWAN STEWART,

    Defendant.
_____/

**UNITED STATES' MEMORANDUM IN SUPPORT OF SENTENCING
AND RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR VARIANCE**

    The United States of America, by and through the undersigned Assistant United States Attorney, hereby submits its memorandum in support of sentencing and response in opposition to defendant's motion for variance, and moves this Honorable Court to impose a sentence of 210 months' imprisonment, followed by lifetime supervised release.

## BACKGROUND

    On December 28, 2023, the Drug Enforcement Administration (DEA) and the Indian River County Sheriff's Office (IRCSO) used a confidential source to conduct a controlled audio/video recorded purchase of methamphetamine from Carlos AVILA (AVILA) (PSI ¶ 5). Prior to the purchase, the defendant left his residence located in Vero Beach, Indian River County, Florida, and drove to AVILA's residence, also located in Vero Beach, Indian River County, Florida (id.). The defendant parked in AVILA's driveway and AVILA conducted what appeared to be a hand-to-hand drug transaction (id.). After the transaction was complete, the defendant quickly left the residence (id.).

Approximately three hours later, the confidential source called AVILA, who instructed him/her to meet him at a location in Vero Beach, Indian River County, Florida (id.). When the confidential source arrived at the location, AVILA retrieved a tan Dillard's shopping bag from the garage of the residence, entered the front passenger seat of the confidential source's vehicle, and exchanged the Dillard's shopping bag, which contained 286.3 grams of methamphetamine, for $4,500 (id.). The methamphetamine subsequently tested positive for methamphetamine at the DEA Laboratory in Miami, Florida, with a pure weight of 276.7 grams (id.).

The tan shopping bag was submitted to the Indian River County Sheriff's Office for fingerprinting where the defendant's right index fingerprint was found on the bag (id.).

On November 21, 2024, a federal grand jury in the Southern District of Florida returned a superseding indictment charging the defendant with one count of conspiracy to possess with intent to distribute fifty grams or more of methamphetamine (actual) (count one), in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A); and three counts of distribution of fifty grams or more methamphetamine (actual) (counts two through four), in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A); and Title 18, United States Code, Section 2 (ECF No. 17).

The defendant pleaded not guilty to the charges in the superseding indictment, and was convicted of counts one and three after a jury trial on February 13, 2025 (ECF No. 110).

According to the PSI, the defendant has a total offense level of 32, a criminal history category of IV, and a ten-year minimum mandatory, which yields an advisory sentencing guideline range of 168-210 months' imprisonment (PSI at ¶¶ 23, 31, 92).

## ANALYSIS

**A. A variance is neither required, nor warranted, based upon the 10 to 1 sentencing disparity between "ice" and methamphetamine.**

While the Court is permitted, but *not* required, to grant a variance based on policy disagreements, such a variance would improperly ignore the defendant's role in the distribution of methamphetamine.

In *Kimbrough v. United States*, the Supreme Court upheld a variance based on policy considerations, and in consideration of the objectives of the 3553(a) factors. *Kimbrough v. United States*, 552 U.S. 85, 89 (2007) and *see United States v. Flores-Perez*, 749 Fed.App'x 793, 798 (11th Cir. 2018). *Kimbrough* granted permissive authority to district courts to grant a variance based on policy considerations, but did not mandate such a variance in every instance. *Flores-Perez*, 749 Fed.App'x at 799 and *United States v. Trejo*, 624 Fed.App'x 709, 715 (11th Cir. 2015) ("While *Kimbrough* and *Spears* "empowered" district courts to vary downward based on a policy disagreement with the applicable guidelines, they did not "command" district courts to exercise this discretion." *citing Dell v. United States*, 710 F.3d 1267, 1279 (11th Cir. 2013)). Instead, a sentence within the sentencing guidelines is expected, but not presumed to be reasonable, so long as it considers the arguments of the parties, the 3553(a) factors, and offers support for its reasoning. *Id*. at 799 and *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016).

An argument that the sentencing guidelines lack empirical support, "does not render reliance on a guideline unreasonable. Rather, it is "one factor" that a district court can consider in exercising its authority to vary from the guidelines." *Flores-Perez*, 749 Fed.App'x at 798-99. After considering the arguments of the parties and the relevant 3553(a) factors, the Court is free to impose a sentence within the sentencing guidelines without error.

As a baseline, neither Congress, nor the sentencing commission have taken steps to modify the sentencing guidelines' treatment of methamphetamine and methamphetamine (actual). The 2024 Sentencing Guidelines maintain the same, previously defined, sentencing ratios under the drug conversation table in section 2D1.1. Presumably, this is because methamphetamine purity is relevant, not only to one's proximity to the source of supply, but a host of other factors, including profitability, danger, and avoiding disparate treatment amongst similarly situated offenders.

While high-purity methamphetamine may be more common today, than at the enactment of the 1986 Anti-Drug Abuse Act, the proliferation of such a dangerous substance does not diminish its danger, nor the importance of considering that danger when fashioning a sentence that is reasonable, but not greater than necessary to achieve the goals laid out in section 3553(a). High-potency methamphetamine remains dangerous and continues to have a profound impact, both on the end user, and indirectly, on his or her community. *See generally, United States v. Guajardo*, 726 Fed. App'x. 768, 770 (11th Cir. 2018) (sentencing court had discretion to consider "the dangerous and addictive nature of methamphetamines") and *see United States v. Sullivan*, 2024WL1500468 at *4 (S.D. Ala. 2024) ("The more meth involved, the greater the destructive impact. The purer the substance, the greater the destructive impact by weight. The 10:1 ratio honors this straightforward reality."). Purity also plays an important role in the defendant's profitability, allowing him to draw customers based on the quality of his product, and affords him the ability to cut the product for further profitability.

In addition, the sentencing guidelines must, to some degree, account for purity, to avoid significant sentencing disparities between defendants who possess similar weights of a mixture and substance of methamphetamine, but with greatly different purities. Absent such a distinction, a defendant who sells a mixture and substance consisting largely of cut, would face the same

sentence as a defendant who sells pure methamphetamine, incentivizing the distribution of higher purity methamphetamine to maximize profit and reduce criminal liability. *Sullivan*, at *4; and *see generally United States v. Bostock*, 910 F.d3d 348, 351 (7th Cir. 2018).

Here, the sentencing factors under section 3553(a) support a sentence within the sentencing guidelines, regardless of how the Court employs the drug quantity table. The defendant is not a low-level or tangential participant in the drug trade, nor a person unaware of his conduct. Rather, he directly profited from the quality, quantity, and type of drugs he obtained and distributed to his customers. The defendant distributed at least 276.7 grams of methamphetamine (actual) during his offense of conviction, and previously distributed at least a pound of methamphetamine to another individual. This conduct is consistent with that of a sophisticated drug distributor, a person engaged in the illegal distribution of narcotics, and not a mere low-level mule or courier. Therefore, the defendant's offense conduct supports the increased penalty built into the guidelines based on substance purity, because he stood to profit from that purity, and unleashed the danger of a pure product on the Vero Beach community.

Therefore, while purity alone, may not automatically suggest a direct connection between a defendant and a methamphetamine manufacturer, the relevant facts of the case suggest that a variance is not warranted based on the 10 to 1 sentencing disparity between "Ice" and methamphetamine.

**B. Departure is not warranted on the grounds of a mental condition, pursuant to § 5H1.3, as the defendant failed to establish that his mental health condition is "extraordinary" by a preponderance of the evidence.[1]**

A defendant seeking a downward departure bears the burden of proof to establish, by a

---

[1] Note, while the defendant styled his pleading as a motion for variance, he cited several arguments in favor of *departure*.

5

preponderance of the evidence, that he is entitled to a downward departure. *United States v. Onofre-Segarra*, 126 F.3d 1308, 1310 (11th Cir. 1997) *citing United States v. Miller*, 78 F.3d 507, 511-12 (11th Cir. 1996).

To establish that a specific offender characteristic merits a guideline departure, the defendant must show that the characteristic is extraordinary, and justifies the departure, as "section 5H1.1-6 prohibit[s] departures from the applicable sentence range in all but extraordinary cases." *United States v. Mogel*, 956 F.2d 1555, 1562 (11th Cir. 1992). The *Mogel* Court acknowledged the existence of the relevant policy statements of section 5H1.1-6, but concluded that "none of the policy statements of that section explicitly authorizes departure from the guideline range on the basis of offender characteristics." *Mogel*, at 1561-62. Specifically, section 5H1.3 provides that:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with offender characteristics, are present to an *unusual* degree and distinguish the case from the typical cases covered by the guidelines.

U.S.S.G. § 5H1.3 (emphasis added).

Here, the defendant claims to suffer from post-traumatic stress disorder (PTSD), stemming from a prior traumatic experience while incarcerated in an Indian River detention center. In support, the defendant submitted a psychological evaluation that concluded the defendant suffers from PTSD and cannabis use disorder. However, the defendant offered no evidence of the severity of his condition, or how his symptoms rank in comparison to other similarly situated defendants, leaving the Court with no way to evaluate whether the defendant's condition is present to an unusual degree, and if it meets the threshold standard for a departure.

Assuming, *arguendo*, that the defendant had met this threshold standard, the defendant also failed to provide evidence that his condition requires special accommodation for the purposes of

sentencing. Specifically, he does not identify how a reduced sentence would mitigate the purported effects of PTSD. The defendant's mental health evaluation makes three suggestions to address his condition: (1) evaluation by a psychiatrist to determine if anti-anxiety medications are appropriate; (2) individual therapy for trauma; and (3) participation in the Bureau of Prisons' Resolve program. However, the report does *not* conclude that the defendant's condition is so unusual that it distinguishes him from other cases, nor that he is unfit for an incarcerative sentence. Thus, from an objective standpoint, even if the Court were to accept the defendant's representations on face value, they only serve to inform the Court about what special conditions are appropriate during incarceration, but do not support a material reduction of sentence. The Bureau of Prisons is well-equipped to handle what is arguably a common, and easily treated, mental health condition. The defendant himself reported participating in such treatment while incarcerated, including one-on-one therapy, and melatonin supplements (PSI ¶ 60).

Therefore, the defendant failed to show that he meets the unusual or extraordinary threshold for a departure on the grounds of a mental or emotional condition, nor does he provide the Court with substantive evidence that a reduced sentence would address his mental health issues. As such, the Court should not depart or vary on this ground.

**C. The § 3553(a) factors also do not support a downward variance.**

When sentencing a defendant, the Court is required to "impose a sentence sufficient, but not greater than necessary" that complies with the purposes of the statute and takes into consideration the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public, to provide the defendant with adequate services, and which considers the kinds of sentences available, the

sentencing ranges, pertinent policy, the need to avoid unwarranted sentencing disparities, and to provide restitution.   18 U.S.C. § 3553(a).

### i.  Nature and Circumstances of the Offense

The nature and circumstances of the defendant's offense conduct in this case demonstrate the danger the defendant posed to the community, and a selfishness on par with the most serious of felonies, due to the dangers of methamphetamine, and the defendant's role in sourcing, purchasing, concealing, preparing, and distributing such a deadly product to the Vero Beach community.

The defendant was a large-scale methamphetamine distributor, responsible for distributing 276.7 grams of pure methamphetamine.  Methamphetamine is a dangerous substance, a psychostimulant with abuse potential, which is a drug category responsible for the deaths of 32,537 people in 2021.[2]  "Overdose deaths involving methamphetamine have risen in the past decade. Many of these deaths also involve opioids, especially synthetic opioids like fentanyl, which may be knowingly consumed with methamphetamine […]."[3]

The defendant was not a mere runner or courier, acting without knowledge of the dangers of his actions.   He was a sophisticated, experienced, drug dealer.   He understood how to conceal his actions, masking the illegal nature of his conduct by placing the drugs in ordinary household items, like a grocery bag, and quickly conducting hand-to-hand transactions to avoid detection. The defendant also conducted drug deals at his residence, in the presence of his children, exposing both his family, and his neighbors, to the real risks of violence that often accompanies drug dealing.

---

[2] National Institute of Health, https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (July 17, 2023).
[3] National Institute of Health, https://nida.nih.gov/publications/drugfacts/methamphetamine (July 17, 2023).

Unlike legitimate industries, drug dealers and users cannot call the police to settle disputes, or to provide protection. Instead, conflicts are solved with violence, as it is the only means available. The defendant's neighbors, and his wider community, bore the brunt of these risks, without any means of deterrence.

Therefore, the nature and circumstances of the offense support a sentence of 210 months.

### ii. History and characteristics of the defendant.

The defendant's background and criminal history also suggest that the defendant knowingly chose to break the law, fully aware of the consequences. The defendant received numerous opportunities over a period of 13 years to reform his conduct, but in each instance, he refused to do so. This conspiracy to distribute methamphetamine (actual) is yet another example of a choice in which the defendant prioritized his own needs above the law, and above the well-being of those around him.

From his very first adult charge, the defendant failed to take advantage of the second chances he received. The defendant began his adult criminal career in 2009 at the age of 15 with charges of burglary of a dwelling, grand theft, attempted burglary of a structure, criminal mischief, burglary of a dwelling while armed, grand theft of a firearm, burglary of a conveyance, and grand theft. He was sentenced to four years in prison, followed by two years of community control. The defendant violated his community control four months after he was released from prison, by leaving the county without permission, and possessing a firearm as a convicted felon. Then, the defendant violated community control a second time, approximately 15 months later, for possession of marijuana.

Less than two years after his release, the defendant sold crack cocaine to an undercover law enforcement officer. As a result, law enforcement searched the defendant's residence, and

found cocaine, psilocybin mushrooms, alprazolam, amphetamine, oxycontin, marijuana, a digital scale, and a Ruger handgun. The defendant pled guilty in federal court to unlawful possession of a firearm by a convicted felon and possession with intent to distribute narcotics, and received a time served sentence, followed by three years of supervised release. Approximately two years later, the defendant violated his supervised release by testing positive for illegal drugs. The Court gave the defendant yet another chance, allowing him to complete drug treatment in lieu of incarceration. Then, ten months after completing supervised release, the defendant committed the instant offense.

The defendant argues that his criminal history is the product of youth, and poor judgment, but the Court must seriously question at what point the defendant's conduct ceases to be a product of youth or recklessness, and becomes an intentional disregard for the law. The defendant received at least five second chances, and squandered them all.

Moreover, the defendant's criminal history is significantly underrepresented because three of his serious prior felonies occurred without an intervening arrest, resulting in no additional criminal history points, and thus no additional penalty, despite the severity and dangerousness of his conduct. In one instance, he burglarized the home of two individuals and stole a firearm (PSI ¶ 27). In another, he broke into a vehicle and stole knives, computers, a car stereo, a passport, a birth certificate, and a social security card (PSI ¶ 28). Finally, he entered a victim's property and caused damage inside (PSI ¶ 26). The sentencing guidelines do not account for any of this conduct. The guidelines also do not account for the defendant's unlawful conduct while incarcerated, notably: fighting, possession of contraband, disorderly conduct, disrespect to officials, and disobeying an order (PSI ¶ 25).

By his own conduct, the defendant demonstrated that he is unwilling to follow the law. Selling large quantities of methamphetamine less than ten months after release from federal supervision, is hard evidence of the defendant's failure to reform his conduct. The defendant's criminal history documents numerous squandered opportunities, and the knowing and intentional nature of his conduct, but only holds the defendant accountable for three of his six criminal convictions. Therefore, a sentence of 210 months is necessary to make a meaningful impression on the defendant, to end the cycle of criminal behavior, and to reform his conduct.

### iii. Promote respect for the law, provide just punishment, and avoid sentencing disparities.

In light of the seriousness of the defendant's conduct, and his knowing participation in a scheme with life and death consequences, it is essential that any sentence account for the conscious, knowing choice the defendant made when he engaged in this methamphetamine (actual) trafficking conspiracy.

The defendant's substantial criminal history suggests that any sentence in this case must be sufficiently serious to promote a respect for the law, acknowledging that each of the defendant's prior sentences have failed to do so. The defendant must also account for the damage he caused to the Vero Beach community by dealing in methamphetamine (actual), a deadly substance. As noted above, methamphetamine is an incredibly dangerous substance, and the risks of violence associated with its distribution are equally deadly. The defendant possessed this dangerous substance with the intent to distribute it to the people in his community. This was an acceptable risk to the defendant, but one that could have easily contributed to the dire statistics of connected to drug distribution in the United States. Therefore, a prison sentence of 210 months is sufficient,

but not greater than necessary, to account for the danger of the defendant's actions, and to send a message to the community that trafficking in methamphetamine will not be tolerated.

      **iv.**    **Provide just punishment and avoid sentencing disparities.**

A 210-month sentence is also sufficient, but certainly not greater than necessary to comply with the 3553(a) factors, while providing just punishment and remaining consistent with other sentences for defendants with similar criminal histories. By way of comparison, the United States offers the following cases involving defendants convicted of drug trafficking offenses for the Court's consideration. *See United States v. Bauer et. al.*, 22-CR-14068 (S.D. Fla.) (defendant sentenced to 180 months' imprisonment (above the top of the guidelines) for possession of fentanyl with intent to distribute and possession of methamphetamine with intent to distribute; defendant was accountable for 12.53 grams of methamphetamine (actual) and 280 grams of fentanyl); *United States v. Andrews*, 21-CR-14045 (S.D. Fla.) (defendant sentenced to 240 months' imprisonment for possession of 211.2 grams of methamphetamine (actual) and a firearm); and *United States v. Andrews*, 2:21-cr-14045 (S.D. Fla.) (career offender sentenced to 240 months' imprisonment after pleading guilty to possession with intent to distribute methamphetamine and possessing a firearm as a convicted felon; defendant was accountable for 211 grams of methamphetamine (actual) and had a criminal history category of VI).

## CONCLUSION

Based on the foregoing, the United States respectfully requests the Court sentence the defendant to 210 months' imprisonment, followed by lifetime supervised release.

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

By:   **/s/Christopher H. Hudock**
Christopher H. Hudock
Assistant United States Attorney
Florida Bar# 92454
101 South U.S. Highway 1, Suite 3100
Fort Pierce, Florida 34950
Telephone: (772) 293-0951
Email: Christopher.hudock@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by either regular U.S. mail or inter-office delivery.

**/s/Christopher H. Hudock**
Christopher H. Hudock
Assistant United States Attorney